## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| MARK FELICE<br>282 Berthoud Tr.,<br>Broomfield, CO 80020 | )<br>)<br>)<br>) | CASE NO.<br><br>JUDGE: |
| Plaintiff, | )<br>) | |
| v. | )<br>) | **COMPLAINT FOR DAMAGES** |
| | ) | **AND INJUNCTIVE RELIEF** |
| HUNTINGTON BANCSHARES<br>INCORPORATED<br>d/b/a The Huntington National Bank, Inc.<br>41 South High St.,<br>Columbus, OH 43287 | )<br>)<br>)<br>)<br>)<br>) | **JURY DEMAND ENDORSED**<br>**HEREIN** |
| **Serve also:**<br>c/o CT Corporation System,<br>Statutory Agent<br>4400 Easton Commons Way<br>Suite 125<br>Columbus, OH 43219 | )<br>)<br>)<br>)<br>)<br>)<br>) | |
| -and- | )<br>) | |
| SAM OLSEN<br>c/o The Huntington National Bank<br>41 South High St.,<br>Columbus, OH 43287 | )<br>)<br>)<br>)<br>) | |
| Defendants. | )<br>) | |

Plaintiff Mark Felice, by and through undersigned counsel, as his Complaint against the Defendant, states and avers the following:

### PARTIES

1. Felice is a resident of the city of Broomfield, Broomfield County, state of Colorado.

2. Defendant HUNTINGTON BANCSHARES INCORPORATED d/b/a The Huntington National Bank, Inc. ("Huntington"), is a foreign limited liability company conducting



The Employee's Attorney.™

business throughout the state of Ohio; a substantial portion of the facts arising in the Complaint, however, took place in or around Columbus, Ohio at Huntington's location.

3. At all times referenced herein, Huntington was Felice's employer within the meaning of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, and/or Ohio R.C. §4112.01(A)(2).

4. Upon information and belief, Defendant OLSEN is a resident of the state of Ohio.

5. Defendant Olsen is and/or was an employee of Huntington.

6. Defendant Olsen did, and at all times hereinafter mentioned, acted directly or indirectly in the interest of Huntington and/or within the scope of his employment at Huntington.

7. At all times referenced herein, Defendant Olsen supervised and/or controlled Felice's employment at Huntington.

8. At all times referenced herein, Defendant Olsen was Felice's employer within the meaning of 42 U.S.C §12111 and R.C. 4112.01(A)(2).

## JURISDICTION & VENUE

9. This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 in that Felice is alleging a Federal Law Claim under Title VII.

10. This Court has supplemental jurisdiction over Felice's state law claims pursuant to 28 U.S.C. § 1367, as Felice's state law claims are so closely related to his federal law claims that they form part of the same case or controversy under Article III of the United States Constitution.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

12. Within 180 days of the conduct alleged below, Felice dual filed a Charge of Discrimination with the Ohio Civil Rights Commission and the Equal Employment Opportunity



Commission ("EEOC", Charge No. 532-2018-02163) against Huntington ("EEOC Charge").

13. On or about August 9, 2018, the EEOC issued and mailed a Notice of Right to Sue to Felice regarding the EEOC Charge.

14. Felice received his Notice of Right to Sue letter from the EEOC in accordance with 42 U.S.C. § 2000e-5(f)(1), which has been attached hereto as Plaintiff's Exhibit 1.

15. Felice has filed this Complaint on or before the 90-day deadline set forth in his Notice of Right to Sue.

16. Felice has properly exhausted his administrative remedies pursuant to 29 C.F.R. § 1614.407(b).

## FACTS

17. Felice is a former employee of Huntington.

18. Felice worked for Huntington as a telecommuting Commercial Sales Direct Manager from May 18, 2010, until Huntington terminated Felice's employment on or about March 6, 2018, for the purported reason of behavior and managerial decision choice; he was also labeled as ineligible for rehire.

19. Felice lives in Colorado but the team he managed for Huntington was based in Columbus, Ohio.

20. It is important to note initially that Felice is homosexual and that his coworkers and Huntington had notice of his sexuality from the beginning of his employment. This places Felice in a protected class for his sex/gender and sexual orientation pursuant to Title VII.

The Employee's Attorney.™ 

21. The early portion of Felice's employment went well; he received numerous awards for his service, was labelled as a "Star Performer," and had consistently excellent performance reviews.

22. Felice started in a treasury management sales specialist position in or around 2010. There, he was quickly recognized as an asset to Huntington and was asked to join the continuous improvement team in 2011.

23. The continuous improvement team was in charge of driving financial performance across the treasury management division and soon thereafter, the commercial organization (i.e. the team monitored key performance metrics in the commercial organization), as the department was absorbed into the commercial department. Felice stayed there until 2013.

24. The improvement team was then centralized at the enterprise level, but the commercial banking department did not want to lose Felice's help.

25. This was due to his excellent performance and contribution to driving increased revenue across the commercial department through the Deal Management program, which Felice created in 2011. Because of this, Felice was kept in that department.

26. The rest of the team, and the majority of other continuous improvement team members across the bank, were centralized by Huntington at the enterprise level.

27. In this transition, Felice then reported to Kathy Loken (an older employee and manager of the proposal direct team) who had also noticed Felice's performance and asked him to continue to build out the deal management team.

28. In or around 2015, Todd Williams reorganized the department and wanted Loken to retire.

29. Loken did not want to retire, but the writing was on the wall at this point.



30. Todd Williams then moved Loken out of a managerial role and put her into a role developing the bank's onboarding process, a move she did not appreciate.

31. In or around mid-2015, Defendant Olson was put in charge of Loken's group. Loken then retired within the next year.

32. Olsen also put Felice in charge of proposal direct and deal management.

33. Felice's first interactions with Olsen were not positive; by no means at that point were the two antagonistic, but their relationship was rocky from the start.

34. Olsen is a gruff and religious (upon information and belief, he is a devout Mormon) man and had a generally negative reputation with his sales colleagues due to his targeting of employees for termination.

35. Felice, on the other hand, had an excellent reputation with his colleagues.

36. Prior to Loken's retirement, she spoke with Felice and told him that Felice needed to watch his back for Olsen, due to the negative reputation Olsen had as a manager, and that he may have problems with Felice's sexual orientation.

37. Loken also told Felice to immediately apply for and talk to Todd Williams about the new role, Commercial Sales Administration Director, that was being slated for Olsen.

38. Felice put together a thorough strategic plan and vision for the department at Todd Williams' request; Olsen got the job over Felice.

39. That the two had to compete for the job put an even greater damper on their relationship; Olsen remarked that Felice was simply riding his coattails.

40. In the end, Olsen ended up using the majority of Felice's long-term plan for the department; he also took the two highest performers from Felice's team at the time, Christina Temple and Lauren Panourgias, moving them to be his directs reports.



41. Olsen took the two into his management team and left the rest of the proposal direct and deal management team for Felice to manage, which needed serious improvement.

42. In or around 2016, Felice was identified by Olsen as someone who should be a "Messenger" for the rollout of the Challenger Sales process.

43. Felice then helped to implement the new sales model and facilitate its training process, focusing on coaching bankers to use insight to lead to a solution, rather than starting with the solution first.

44. At one of the Challenger workshop events, Olsen commented on Felice's fashion.

45. During this time, Olsen also wanted to hire a manger for the performance and incentives team, where Panourgias now worked alongside John Eggenspiller and Crystal Bradley.

46. Olsen wanted to put Panourgias in this management position, a position Eggenspiller was most suited due to his years and experience on the team and in the role; Olsen, however, did not want Eggenspiller in charge.

47. Instead, Olsen began to target Eggenspiller, looking for reasons to have Eggenspiller's employment terminated.

48. Shortly after he began, Olsen fired Eggenspiller, to Eggenspiller's surprise, saying that Eggenspiller was "not what was needed for the role."

49. Olsen then promoted Panourgias to that management position.

50. Olsen agreed to multiple pay raises for Panourgias in order to keep her at the bank as she had threatened multiple times to leave due to the stress and being underpaid; those raises worked to keep her at Huntington.

51. When Panourgias first started on Felice's team a couple of years prior, she started with a salary around $43,000. At this point under Olsen, she was now making around $94,000.



52. By in or around autumn of 2017, there was a near-100% turnover of employees in the department. Olsen and Felice's relationship turned even more sour.

53. At that point, Olsen claimed to trust Felice in his position and communicated little about his job duties.

54. During this time, Felice began to notice some inappropriate relations between Olsen and Panourgias; she simply knew too much of the inner-most workings of the bank and there was a lot of personal and inappropriate information shared between the two.

55. Again, Panourgias was not that interested in staying with Huntington due to the stress and low compensation. She told Felice that Olsen placed the blame for her desire to leave on Felice.

56. Panourgias also tended to lean on Felice, she would go to him for advice and guidance on how to deal with the uncomfortable position and situation she was in, on multiple occasions, with Olsen.

57. This further upset Olsen, and he told her to stop going to happy hour events with Felice and her other coworkers as Felice was "poisoning the well" against him.

58. Felice had a video teleconference with Olsen, Panourgias, Amy Schroyer, and Agata Moceri in October or November of 2017.

59. In the video conference, Olsen again made special note to comment on Felice's sweater, saying "I see you're wearing your Versace sweater today."

60. Felice took note of this again, first as he was not wearing Versace, and second as Gianni Versace is a renown homosexual clothing designer.

61. The purpose of the meeting was to discuss team updates from each of Olsen's direct reports (Felice, Shroyer, Moceri, and Panourgias).

The Employee's Attorney.™ 

62. At this meeting, Olsen provided an update as to the status of Private Bank rolling out the Challenger sale, which Olsen expected and was positioning himself to roll out and support.

63. Olsen said that the private banking department was now looking to roll out the program.

64. Olsen was disappointed because he wanted a greater leadership role in the program's implementation in the private and business banking departments.

65. However, the private bank evidently did not want Olsen in the role, and so went in a different direction. Because of this change in direction, the department opened a position equivalent to Olsen's to roll out and support the program for the private bank.

66. At that point, there were only two people at Huntington qualified for that role: Felice and Schroyer.

67. Olsen did not want either in the role and so he sat on communicating this direction to Felice and Schroyer from private bank and the available posting until the posting was taken down; an outside candidate was identified and chosen, and it was too late for either Felice or Schroyer to apply.

68. Olsen effectively blackballed Felice from moving up at the bank.

69. Upon information and belief, Schroyer was later terminated from her employment. She was allowed to continue working with Huntington as an independent contractor, however, in disparate comparison to Felice.

70. Because of this unfair action and his previous treatment by Olsen, Felice began to feel some unease regarding his continued employment.

71. Felice called Olsen and asked if he should be worried; Olsen told him that there would be some changes coming at Huntington, but that Felice need not worry as he still had his job and that bonuses were coming in March.



72. Felice took this to imply that he may not still have his job after the bonuses came out.

73. At this point, Olsen also placed a target on Moceri's (an older, Polish woman) back.

74. Olsen was trying to build a case against Moceri for the purported reason of her high expenses, sensitive information which he shared with Panourgias who relayed it to Felice.

75. Because of the high turnover in the team Felice was given, he hired several new employees.

76. Felice had wanted to hire Stacy Brant, a woman with the private banking department.

77. Felice interviewed her and placed her name forward to Olsen for hire.

78. Brant then met with Olsen, who commented to Felice that "we don't need to hire 'that'."

79. It is important to note that Brant is an older, slightly frumpy woman. Olsen, when referring to "that," was not talking about her skills as an employee; those qualifications were clear from her continued employment at the private bank. Rather, Brant's appearance as he wanted a youthful, more attractive appearance for his team, was the reason for passing over her.

80. Olsen blackballed Brant's hire and instead hired younger, more attractive people to the team.

81. In or around January 2018, Felice went on vacation.

82. Felice had expected Olsen to have him approve the bonuses prior to the vacation, but Olsen did not award the incentive to Felice's employees to help determine those bonuses yet.

83. On or about January 19, while Felice was on vacation, Olsen texted Felice wanting to review point allocations and to approve the bonuses for subordinates.

84. Felice noted that that did not need to happen until Friday, but gave his log-in information to Olsen anyway so that he could approve the bonuses.

85. Upon information and belief, Olsen used this time to snoop into Felice's files.

The Employee's Attorney.™ 

86. Felice noted his concern that Olsen would snoop through his files to another employee with knowledge of the process and asked whether Olsen actually needed his log-in information to approve the bonuses.

87. Felice was told that Olsen could actually override Felice's approval, and did not need his log-in info to do so. Olsen was aware he could approve them without the log-in information.

88. Felice returned from vacation on or about January 24, 2018.

89. That Saturday, Felice received an email from HR noting that a case had been opened.

90. Felice, thought the email was due to a situation with Andy Byerly, one of the few original members of his team who had had an outburst at work for which Felice wrote him up.

91. Felice emailed his HR contact, Denise Williams, to ask about the case; when he didn't hear back from her over the weekend, he instant messaged Denise Williams on Monday to again, ask about the email, and she told him it was a glitch in the HR system and had since been corrected.

92. Felice then reviewed his emails and saw that that case email and his email exchange with Denise Williams had indeed been deleted.

93. The instant message conversation between the two, however, had not been deleted.

94. Felice held onto a copy of that conversation as he was expecting the same ouster attempts from Olsen that he had seen happen to others.

95. At a happy hour event with Felice, his team, and Olsen on or about February 5, 2018, Olsen commented on Felice's Gucci shoes. Again, this stuck out to Felice as it was another reference to gay fashion.



96. The purportedly erroneous and nonexistent investigation into Felice then continued, semi-unbeknownst to Felice.

97. Felice had one call with Jennifer Bandenieks of HR, where she quoted something Felice had said in a workshop in February, furthering his fear that the investigation did exist and that he would not have the opportunity to defend himself in it.

98. Felice then spoke with Olsen about the investigation, who told him not to fight it if he wanted to keep his job. Unfortunately, Felice heeded his advice due to his fear of termination, eventually leading to his termination.

99. After the end of his employment, Felice spoke with his team once again, and learned that none of his team members who were in protected classes were questioned about his investigation; only those who did not fall into protected classes were interviewed.

100. On or about March 6, 2018, Felice's employment was terminated.

101. On or about March 9, 2018, Felice spoke with a coworker and shared Moceri's situation, again, something that was shared by Panourgias with Felice, from her private and inappropriate conversations with Olsen.

102. Moceri had had a meeting with Olsen and Williams where they told her she had 30 days to find new employment. Moceri, however, is in multiple protected classes and so Olsen found it difficult to force her out of her position. Further, her husband is an attorney, and the bank was likely afraid of his potential response to her ouster.

103. Felice was discriminated against by Defendants for being homosexual.

104. Defendants' purported reason for Felice's termination was pretextual.



105. Felice's employment with Huntington was actually terminated due to his sexual orientation, and/or in retaliation for making complaints of discrimination and harassment in the workplace.

106. There was a causal connection between Felice's protected classes (sex/gender and sexual orientation) and complaints and Huntington's adverse actions taken against Felice.

107. Huntington did not proffer any legitimate non-discriminatory reason for terminating Felice's Agreement and employment with Huntington.

108. Huntington's purported reason for terminating Felice's Agreement and employment with Huntington was pretext for sex/gender and sexual orientation discrimination.

109. As a result of being treated disparately on the basis of his sex/gender and sexual orientation, and being terminated from Huntington, Felice has suffered severe emotional distress, anxiety, and depression. He has had and continues to accrue damages based thereupon.

### COUNT I: GENDER/SEX DISCRIMINATION IN VIOLATION OF TITLE VII

110. Felice restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

111. Felice is a member of a statutorily protected class based on his sex/gender and sexual orientation under Title VII.

112. During his employment with Huntington, Felice was able to successfully perform the essential functions of his job.

113. Huntington and Olsen treated Felice differently than other similarly situated employees based on his sex/gender and sexual orientation.



114. Huntington and Olsen discriminated against Felice on the basis of his sex/gender and sexual orientation by, among other ways, terminating his employment with Huntington, refusing to promote him by failing to allow him to see relevant job postings, and treating him disparately in comparison with other, heterosexual employees.

115. Huntington's discrimination against Felice based on his sex/gender and sexual orientation violates Title VII.

116. Huntington violated Title VII when they terminated Felice's Agreement and employment with Huntington based on his sex/gender and sexual orientation.

117. Upon information and belief, following the termination of Felice's Agreement and employment with Huntington, Defendant replaced him with someone outside his protected class.

118. As a direct and proximate result of Huntington's conduct, Felice suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

**COUNT II: GENDER/SEX DISCRIMINATION IN VIOLATION OF OHIO REVISED CODE § 4112.02(A), et seq.**

119. Felice restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

120. Felice is a member of a statutorily protected class based on his sex/gender and sexual orientation under R.C. § 4112.02.

121. During his employment with Huntington, Felice was able to successfully perform the essential functions of his job.

122. Huntington treated Felice differently than other similarly situated employees based on his sex/gender and sexual orientation.



123. Huntington discriminated against Felice on the basis of his sex/gender and sexual orientation by, among other ways, terminating his employment with Huntington.

124. Huntington's discrimination against Felice based on his sex/gender and sexual orientation violates R.C. § 4112.02.

125. Huntington violated R.C. § 4112.02 when they terminated Felice's Agreement and employment with Huntington based on his sex/gender and sexual orientation by, among other ways, terminating his employment with Huntington, refusing to promote him by failing to allow him to see relevant job postings, and treating him disparately in comparison with other, heterosexual employees.

126. Upon information and belief, following the termination of Felice's Agreement and employment with Huntington, Huntington replaced him with someone outside his protected class.

127. As a direct and proximate result of Huntington's conduct, Felice suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

### COUNT III: WRONGFUL TERMINATION BASED ON GENDER/SEX DISCRIMINATION

128. Felice restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

129. On or about March 6, 2018, Defendants terminated Felice's employment.

130. Defendants' purported reason for Felice's termination was pretextual.

131. At all times material herein, similarly situated employees of outside of Felice's protected gender/sex and sexual orientation class, who engaged in similar or worse conduct



than Felice, were not terminated without just cause. Further, Schroyer was allowed to return as an independent contractor, an offer Felice was not given.

132. Defendants actually terminated Felice's employment based on his gender/sex and sexual orientation.

133. Felice's gender/sex and sexual orientation was a determinative factor in Defendants' decision to terminate his employment.

134. Upon information and belief, Defendants replaced Felice with an individual outside of Felice's gender/sex and sexual orientation protected class.

135. Defendants violated 42 U.S. Code § 2000e, *et seq.* when it terminated Felice's employment based on his gender/sex and sexual orientation.

136. As a direct and proximate result of Defendants' conduct, Felice has suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

## DEMAND FOR RELIEF

WHEREFORE, Felice demands from Huntington the following:

a) Issue a permanent injunction:

  i. Requiring Huntington to abolish discrimination, harassment, and retaliation;

  ii. Requiring allocation of significant funding and trained staff to implement all changes within two years;

  iii. Requiring removal or demotion of all supervisors who have engaged in discrimination, harassment, or retaliation, and failed to meet their legal responsibility to promptly investigate complaints and/or take effective action to stop and deter prohibited personnel practices against employees;



    iv.    Creating a process for the prompt investigation of discrimination, harassment, or retaliation complaints; and

    v.    Requiring mandatory and effective training for all employees and supervisors on discrimination, harassment, and retaliation issues, investigations, and appropriate corrective actions;

b) An award against Huntington for compensatory and monetary damages to compensate Felice for physical injury, physical sickness, lost wages, emotional distress, and other consequential damages, in an amount in excess of $25,000 per claim to be proven at trial;

c) An award of punitive damages against Huntington in an amount in excess of $25,000;

d) An award of reasonable attorneys' fees and non-taxable costs for Felice's claims as allowable under law;

e) An award of the taxable costs of this action; and

f) An award of such other relief as this Court may deem necessary and proper.

Respectfully submitted,

*/s/Matthew G. Bruce*_____
Matthew Bruce (0083769)
    Trial Attorney
Evan McFarland (0096953)
**THE SPITZ LAW FIRM, LLC**
25200 Chagrin Blvd., Suite 200
Beachwood, OH 44122
Phone: (513) 883-1147
Fax:    (216) 291-5744
Email: matthew.bruce@spitzlawfirm.com
Email: evan.mcfarland@spitzlawfirm.com

*Attorneys for Plaintiff Mark Felice*



## JURY DEMAND

Plaintiff Mark Felice demands a trial by jury by the maximum number of jurors permitted.

*/s/Matthew G. Bruce*
Matthew Bruce (0083769)

